1
2
3
4
5
6       UNITED STATES  DISTRICT COURT

7       NORTHERN DISTRICT OF CALIFORNIA

8

9   STAN LACKEY, A.K.A. JOHN LONDON,
    JOHN LONDON, LTD., DENNIS CRUZ,
10  CHRIS TOWNSEND,

11                                                  No. C 06-03987 MHP

                    Plaintiffs,
12
            v.
13                                                  **MEMORANDUM & ORDER**
    CBS RADIO INC., PENN JILLETTE, DOES            **Re: Defendant Penn Jillette's Motion**
14  3-10,                                          **for Summary Judgment**
                    Defendants.
15
    _____/
16

17          Plaintiffs Stan Lackey, aka "John London" ("London"), John London, Ltd., Dennis Cruz

18  ("Cruz"), and Chris Townsend ("Townsend") bring this diversity action against defendants CBS

19  Radio, Inc. ("CBS"), CBS Radio Stations, Inc. and Penn Jillette.  On August 24, 2007, the court

20  dismissed CBS Radio Stations, Inc.  Docket Entry 98.  The remaining defendants are CBS Radio,

21  Inc. and Penn Jillette.  Now before the court is defendant Penn Jillette's motion for summary

22  judgment against the plaintiffs who assert three causes of action: 1) interference with contract, 2)

23  interference with prospective economic advantage, and 3) intentional infliction of emotional distress.

24   Having considered the parties' arguments and for the reasons set forth below, the court enters the

25  following memorandum and order.  In addition to defendant Penn Jillette's motion, plaintiffs and

26  defendant CBS have filed cross-motions for summary judgment which are also before the court.  A

27  separate memorandum and order is issued on that motion.

28

BACKGROUND

The court references its accompanying order ruling on plaintiffs' and defendant CBS's cross-motions for summary judgment. Many of the facts underlying this motion are described in that order and are not repeated here. To summarize, plaintiff John London and defendant Penn Jillette are talk-radio personalities who hosted back-to-back shows broadcast on a CBS-owned San Francisco radio station KIFR-FM. London, whose show used a violent and confrontational format, frequently attacked Jillette and on more than one occasion called for his death. See Inferno Tracks CD, Track 3. Jillette's management team was aware of London's show and they received emails from Jillette's listeners reporting London's attacks. See Barnhart Dec. Exh. O. On April 6, 2006, London opened his show with the following "audience promotion": "I'm offering . . . $5,000 for the person who kills Penn Jillette. Now, I'll add $2,000—that's a total of $7,000—if there is some suffering involved. If it's a clean kill, five grand." Cruz. Dec. ¶ 20, Exh. C. The next day, on April 7, CBS terminated all three plaintiffs. Plaintiffs have now brought this action against defendant Penn Jillette, asserting that Jillette and his management team tortiously interfered with their employment contracts and economic relations and caused them to suffer emotional distress. Plaintiffs' theory of the case is that CBS's decision to terminate the plaintiffs was driven by Jillette's demands that they be fired.

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. R. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the

1  opposing party will have the burden of proof at trial, the moving party need only point out "that

2  there is an absence of evidence to support the nonmoving party's case." Id.

3       Once the moving party meets its initial burden, the nonmoving party must go beyond the

4  pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

5  genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving

6  party's allegations. Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir.

7  1994). The court may not make credibility determinations, and inferences to be drawn from the

8  facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New

9  Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

10       The moving party may "move with or without supporting affidavits for a summary judgment

11  in the party's favor upon all or any part thereof." Fed. R. Civ. P. 56(a). "Supporting and opposing

12  affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in

13  evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated

14  therein." Fed. R. Civ. P. 56(e).

15

16  DISCUSSION

17  I.    Interference With Contract

18       The tort of interference with contract requires the following elements: (1) a valid contact

19  between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's

20  intentional acts designed to induce a breach or disruption of the contract; (4) actual breach or

21  disruption; and (5) resulting damage. Quelimane Co. v. Stewart Title Guaranty Co., 19 Cal. 4th 26,

22  55 (1998). In the court's companion order ruling on plaintiffs' and defendant CBS's cross-motions

23  for summary judgment, the court finds that there is no dispute that all three plaintiffs had valid

24  employment contracts with CBS. Second, construing the evidence in the light most favorable to the

25  plaintiffs, it is reasonable to infer that since Jillette's management team was aware of the London

26  show and, thus, his contract with CBS prior to April 7, so too was Jillette himself. It is also

27  reasonable to infer that Jillette's management team discussed with Jillette the attacks London made

28

3

1      in January, February and March calling for his death.  As to the fourth and fifth elements it is

2      undisputed that plaintiffs' contracts were disrupted when they were terminated and as a result, they

3      suffered damage.

4           Regarding the third element requiring intentional acts designed to induce a breach of

5      contract, defendant Jillette has testified that on the day plaintiffs were fired, Jillette was in contact

6      with CBS executive Rob Barnett because he was concerned for his safety and the safety of his

7      family and his on-air co-host.  Jillette Dep. 106–107, 111–112.  Jillette testified that he never wanted

8      the plaintiffs fired and never told Barnett or any other CBS executive to fire the plaintiffs.  Id.

9      346–347.  The defendant has met his initial burden to point out that there is an absence of evidence

10     to support the plaintiffs' case.  The plaintiffs, as the nonmoving parties who bear the burden of proof

11     at trial, must therefore go beyond the pleadings to set forth specific facts showing that there is a

12     genuine issue for trial.  Plaintiffs point to an April 7 email sent from Michael Goudeau, Jillette's on-

13     air co-host, in response to one of Jillette's listeners concerned about London's solicitation.  The

14     email states, "[w]e've sent it on to the boss at CBS and I [Goudeau] expect there will be something

15     done about it."  Barnhart Dec., Exh. K, JIL 031.  The testimony of the local station manager Ken

16     Kohl indicates that Barnett first learned of the on-air solicitation from Jillette's management team.

17     Kohl testified that Barnett first heard about the incident from "Penn Jillette's people."  Kohl Dep.

18     226, 228.  Plaintiffs also point out that Jillette directed his managers Ken "Krasher" Lewis and Peter

19     "Spicoli" Golden to communicate with CBS and to "take care of this."  Jillette Dep. 121–122,

20     143–144, 147, 149.  The record, however, does not contain any deposition testimony or declaration

21     from either Krasher or Spicoli, and therefore, does not reflect what they may have communicated to

22     CBS.  The record is also unclear as to Krasher's and Spicoli's authority in dealing with matters

23     related to Jillette and his relationship with CBS.  See id. 469–470.  Plaintiffs bear the burden of

24     proof at trial, and therefore, it is plaintiffs' burden to come forward with deposition testimony or

25     other evidence establishing the content of the communications between Krasher, Spicoli, and CBS

26     executives.  In the absence of this kind of additional evidence, the current record shows that Jillette

27     and his management team communicated with CBS in order to convey their understandable concern

28

4

1  for the safety of Jillette and his family.  Plaintiffs have failed to oppose defendant's motion for

2  summary judgment with "significant probative evidence" that the communications between Jillette,

3  Jillette's management team, and CBS were designed to induce a breach of contract.  Bias v.

4  Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007).  Accordingly, defendant is entitled to summary

5  judgment as to this cause of action.

6

7  II.       Interference With Prospective Economic Advantage

8

9         The elements of intentional interference with prospective economic advantage are similar to

10  the elements of inducing breach of contract[1], with the exception that unlike interference with

11  contract, liability is contingent upon an additional showing that defendant's conduct was "wrongful

12  by some legal measure other than the fact of interference itself."  Korea Supply Co. v. Lockheed

13  Martin Corp., 29 Cal. 4th 1134, 1154 (2003).  In other words, there must be some "independently

14  wrongful conduct."  Id.  "An act is not independently wrongful merely because defendant acted with

15  an improper motive."  Id. at 1159.  Rather, "an act is independently wrongful if it is unlawful, that is,

16  if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable

17  legal standard."  Id. (through bribes and sexual favors, defendants engaged in unlawful behavior in

18  order to secure a contract and therefore, defendants' acts, in addition to interfering with plaintiffs'

19  business expectancy, were wrongful in and of themselves).

20         In this instance, plaintiffs' prospective economic advantage claim involves the same alleged

21  conduct with the same economic relationship as plaintiffs' claim for inducing breach of contract.

22  Jillette's alleged interference with plaintiffs' employment at CBS is simply "interference" and

23  cannot be independently wrongful other than the fact of interference itself.  Moreover, as the court

24  has already discussed, plaintiffs have not come forth with sufficient evidence to demonstrate that

25  defendant's conduct was designed to interfere with plaintiffs' contracts or otherwise disrupt their

26  economic relationship with CBS.  Accordingly, defendant is entitled to summary judgment on this

27  cause of action.

28

5

1

III.     Intentional Infliction of Emotional Distress

2

3      The tort of intentional infliction of emotional distress requires extreme and outrageous

4 conduct that results in severe emotional distress.  Extreme and outrageous conduct is defined as

5 conduct "so extreme as to exceed all bounds of that usually tolerated in a civilized community."

Chirstiansen v. Superior Court, 54 Cal. 3d 868 (1991).  The conduct alleged in this case involves

6 statements Jillette made to various people including his management team and CBS executives.

7 These statements expressed Jillette's concern for his personal safety.  The court concludes that no

8 reasonable jury could find that these statements are extreme and outrageous.  Indeed, they are a

9 natural reaction to plaintiff London's extreme and outrageous murder solicitation.  As for severe

10 emotional distress, London states that his termination was "very distressing and surprising and

11 shocking" and that he is concerned about his ability to secure future employment.  London Dep.,

12 262:19-263:3.  The court also concludes that based on this evidence, no reasonable jury could find

13 that plaintiffs have suffered severe emotional stress beyond the strain normally associated with

14 losing a job.  Accordingly, defendant is entitled to summary judgment as to this cause of action.

15

16

CONCLUSION
17

18      Defendant's motion is GRANTED as to all three causes of action for 1) interference with

19 contract, 2) interference with prospective economic advantage, and 3) intentional infliction of

20 emotional distress.

21

22 IT IS SO ORDERED.

23
Dated: January 31, 2008
24

25

MARILYN HALL PATEL
26                                      United States District Court Judge
27                                      Northern District of California

28

6

ENDNOTES

1.  The elements are: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.  Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153 (2003).

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**