UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STAN LACKEY, A.K.A. JOHN LONDON,
JOHN LONDON, LTD., DENNIS CRUZ,
CHRIS TOWNSEND,

        Plaintiffs,

  v.

CBS RADIO INC., CBS RADIO STATIONS,
INC., PENN JILLETTE, DOES 3-10,

        Defendants.
_____/

No. C 06-03987 MHP

**MEMORANDUM & ORDER**
**Re: Plaintiffs' and Defendant CBS Radio, Inc.'s Cross-Motions for Summary Judgment**

Plaintiffs Stan Lackey, aka "John London" ("London"), John London, Ltd., Dennis Cruz and Chris Townsend bring this diversity action against defendants CBS Radio, Inc. ("CBS"), CBS Radio Stations, Inc. and Penn Jillette. On August 24, 2007 the court dismissed CBS Radio Stations, Inc. Docket Entry 98. The remaining defendants are CBS Radio, Inc. and Penn Jillette. Now before the court are cross-motions for summary judgment filed by plaintiffs and by defendant CBS. The issue is whether CBS is liable to the plaintiffs for breach of their employment contracts. Having considered the parties' arguments and for the reasons set forth below, the court enters the following memorandum and order. In addition to the cross-motions by plaintiffs and CBS, defendant Penn Jillette's motion for summary judgment is also before the court. A separate memorandum and order is issued on that motion.

BACKGROUND

This case involves the termination of talk-radio show host John London and his two on-air sidekicks, Dennis Cruz and Chris Townsend. In October 2005, London signed an employment contract with KIFR-FM, a CBS-owned radio station in San Francisco, to host a program called "John London's Inferno." Lackey Dec. ¶ 8; Roth Dec. Exh. B. Cruz and Townsend also signed agreements with KIFR-FM. Cruz Dec. ¶ 4; Townsend Dec. ¶ 4. Cruz was the show's producer and London's on-air co-host, and Townsend was the show's "sports guy." Roth Dec. Exhs. C & D. KIFR-FM also broadcast a show hosted by Penn Jillette, the self-described "larger, louder half" of the Las Vegas based comedy and magic duo "Penn & Teller." Jillette Dec. ¶ 2. Penn Jillette's show immediately preceded "John London's Inferno." Roth Dec. Exh. A ¶ 17. On April 6, 2006, London began his radio show by offering $5,000 to anyone who would kill Penn Jillette, with a bonus of $2,000 if Jillette suffered before he died. Roth Dec. Exhs. G & H. The next day, London, Cruz and Townsend were terminated. Lackey Dec. ¶ 19; Cruz Dec. ¶ 38; Townsend Dec. ¶ 10. They filed this action against defendant CBS for breach of contract, alleging that their employment agreements were terminable only for just cause.

By way of background, in December 2004, the infamous radio talk-show host Howard Stern announced that he would leave CBS to join Sirius Satellite Radio at the end of 2005. Barnett Dec. ¶ 10. In response, CBS began to develop a Howard Stern replacement strategy. Id. ¶¶ 2–3. Led by Rob Barnett, CBS's President of Programming, CBS developed an all-talk radio format and branded it "Free-FM" to emphasize both "free spirited, fun radio" and the availability of content free of charge. Id.; Barnett Dep. 45:15–46:11. The "Free-FM" brand was marketed nationwide, but each individual station was managed locally and was programmed with a mix of shows to suit the local market. Barnett Dec. ¶ 3. The CBS-owned San Francisco radio station KIFR-FM was converted from a Christian format to the "Free-FM" format. Id. As general manager of KIFR-FM, Ken Kohl was in charge of the station's on-air programming and had authority to hire and fire the station's on-air talent. Barnett Dep. 128:20–129:8; Kohl Dep. 53:6–54:10.

In May 2005, plaintiffs John London, Dennis Cruz and Chris Townsend produced an audition tape for CBS after learning that CBS was searching for on-air talent to replace Howard Stern and was looking for "all guy all the time. It's booze. It's sex. It's violence. It's sports." Lackey Dec. ¶¶ 6–7; Lackey Dep. 98:7–8. The graphic and violent audition tape touched upon such topics as John London threatening to slit CBS's board operator's throat, the gruesome mutilation of two people by monkeys, and an interview with a caller who discussed his plans to eradicate various populations he found to be undesirable. Cruz. Dec. ¶ 3, Exh. A. Ken Kohl, manager of the San Francisco KIFR-FM radio station, received a copy of this audition tape. Kohl Dep. 42:22–43:13, 53:6–11. Ken Kohl then contacted London to explore the possibility of London being hired to perform on KIFR-FM. Id. 57:10–25. Eventually, Kohl negotiated the terms of London, Cruz and Townsend's employment contracts with London's agent and manager Lisa Miller. Id. 59:9–12, 63:15–64:4, 64:22–66:16.

On October 20, 2005, Ken Kohl signed letters with all three plaintiffs to memorialize and "confirm [their] conversation regarding the proposal of compensation and terms" offered by the radio station. Roth Dec. Exhs. B–D. All three short-form letters described the plaintiffs' position, salary and benefits and stated that they were being hired for "a Two (2) Year no-cut Agreement terminable by just cause only." Id. Miller and Kohl agreed to this just cause termination clause, but they had no further discussions about its definition or meaning. Miller Dep. 50:9–51:7; Kohl Dep. 67:1–69:16. In all three short-form letters, "the parties agree[d] to negotiate in good faith to execute [long-form agreements] which [would] contain the terms and conditions defined [therein] as well as any other mutually agreed-upon terms and conditions." Id. Although there were negotiations regarding the long-form agreements, none were actually executed. Miller Dep. 51:16–53:9; Kohl Dep. 73:8–74:24.

On November 2, 2005, after the short-form letter agreements were executed and after the show had gone on the air, Cruz and Townsend each signed an employment application requesting biographical information such as age, address, phone number, education, and employment history. The final page of this employment application stated, "I acknowledge that if I am hired by [CBS],

my employment will be at will and that my employment and compensation may be terminated at any time, with or without notice, and with or without cause, by me or by [CBS]." Roth Dec. Exhs. E & F; Add'l Exhs. CBS 250–253. These employment applications did not reference the October 20, 2005 short-form letters, nor did they describe in the same detail as the short-form letters, the terms of Cruz and Townsend's employment. Unlike Cruz and Townsend, London did not sign an employment application.

Plaintiffs' radio show "John London's Inferno" was broadcast from late October 2005 through early April 2006 at which time all three plaintiffs were fired. Lackey Dec. ¶¶ 10, 18; Kohl Dep. 71:10–13. During that time, the show was one of KIFR-FM's most popular programs, and in the 2005-2006 winter Arbitron survey, London had the highest ratings of any KIFR-FM talk show host. Kohl Dep. 222:11–18, 219:21–25. The radio show, like the plaintiffs' audition tape, focused on violent, offensive, and confrontational subject matter. For example, London encouraged listeners to go to the station and beat up the stations's program director; he also discussed killing the station manager Ken Kohl by setting him on fire and throwing him off the roof; and he asked a convicted mobster if he wanted "one more job" killing London's ex-wife. Cruz Dec. Exhs. C-E.

Some of London's comments were targeted at Penn Jillette, the Las Vegas based magician who hosted the show broadcast on KIFR-FM immediately before London's show. Cruz Dec. ¶ 13–15, Exhs. C & F. In January London performed on-air prayers asking God to kill Jillette; in February London said that he would like to kill Jillette personally; and in March London incited Muslim terrorists to kill Jillette. Id. ¶¶ 14, 22, 26, Exh. A. The radio station used "dump buttons" to screen out inappropriate content before it was actually broadcast after a several-second delay. Kohl Dep. 124:19–125:9. Many violent and confrontational segments were not dumped and none of the segments directed at killing Jillette were ever dumped.

On April 6, 2006 John London began his show with the following "audience promotion": "I'm offering . . . $5,000 for the person who kills Penn Jillette. Now, I'll add $2,000—that's a total of $7,000—if there is some suffering involved. If it's a clean kill, five grand." Cruz Dec. ¶ 20, Exh. C. London informed his audience that Jillette lived in Las Vegas. Id. As London's on-air

4

sidekicks, Cruz and Townsend added occasional comments and laughter. Id. London's kill-Penn-Jillette offer was not dumped by the station screeners.

The next day, April 7, 2006, Rob Barnett, CBS's President of Programming (who was in charge of developing the "Free-FM" talk-radio format to replace the departing Howard Stern), learned about plaintiffs' kill-Penn-Jillette offer and was alarmed by the situation. Barnett Dec. ¶¶ 5–6. Barnett testified that he did not recall how he became aware of the situation or who may have informed him. Barnett Dep. 181:4–183:13. Barnett then contacted various individuals including Ken Kohl, the local station manager; Joel Hollander, CBS's Chairman and CEO; Penn Jillette; and Penn Jillette's manager. Id. ¶¶ 6–7, 9. Kohl responded to the situation by speaking with London and London's agent Lisa Miller. Kohl Dep. 240:22; Miller Dep. 61:13–22. Both Kohl and Miller advised London to defuse the situation by apologizing or at least clarifying that his kill-Penn-Jillette offer was not serious. Kohl Dep. 240:22–241:11; Miller Dep. 66:20–68:15. London refused to extend either an apology or a clarification. Id.; London Dep. 201:3–16. CEO Joel Hollander responded to the situation by listening to a recording of the broadcast, calling Kohl to ask why London should not be fired, and speaking to CBS's attorneys. Hollander Dec. ¶¶ 2–4, 10–11; Hollander Dep. 17:22, 21:15, 21:23–22:3. After arriving at the conclusion that London's broadcast was "unconscionable," Hollander decided to fire London, Cruz and Townsend. Hollander Dec. ¶ 4. Hollander testified that this decision was his alone. Hollander Dep. 25:9–25:11. By the end of the day on April 7, 2007, all three plaintiffs were officially terminated. On May 30, 2006, plaintiffs filed this action naming both CBS and Penn Jillette as defendants.

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

party. Id. The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

The moving party may "move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed. R. Civ. P. 56(a). "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

DISCUSSION

Plaintiffs claim that defendant CBS breached their employment contracts which, allegedly, were terminable only by just cause. Plaintiffs argue that summary judgment should be granted in their favor because there is no dispute that defendants breached the "just cause" clause by failing to conduct an adequate investigation and to provide an opportunity for plaintiffs to be heard. As to defendant's cross-motion for summary judgment, plaintiffs argue that summary judgment should be denied because genuine issues of material fact exist as to whether plaintiffs' conduct constituted good cause to terminate.

## I. Termination At-Will or for Just Cause Only

All wrongful employment termination cases begin with the presumption of at-will employment. Cal. Lab. Code § 2922. Parties are free to contract around the default of at-will employment if they expressly or impliedly agree that "the employer's power to terminate employment [will] be limited in some way." Harden v. Maybelline Sales Corp., 230 Cal. App. 3d 1550, 1554 (1991). Courts have repeatedly held that, as a matter of law, where an at-will employment agreement is expressly stated and fully integrated, a contradictory agreement to terminate only for good cause cannot be implied. Batch v. Russ Berrie & Co., 1994 WL 634052, *5 (N.D. Cal. 1994).

On October 20, 2005, all three plaintiffs—London, Cruz and Townsend—signed short-form letters expressly stating that they were being hired for a "Two (2) Year no-cut Agreement terminable by just cause only." These letters contained employment terms, actively negotiated between the plaintiffs' agent Lisa Miller and the radio station manager Ken Kohl, regarding the plaintiffs' position, compensation and benefits. Each plaintiff signed his respective letter. In turn, the letters were signed either with typewritten or handwritten signatures of Ken Kohl. For purposes of this cross-motion for summary judgement, defendants have conceded that Ken Kohl had authority to enter into these contracts on behalf of CBS. Therefore, the court concludes, and defendants concede, that the October 2005 short-form letters created enforceable agreements between each plaintiff and defendant CBS. The express language of the short-form agreements is sufficient to contract around the default of at-will employment, and accordingly, under these agreements all three plaintiffs were terminable by just cause only.

The issue for the court is whether Cruz and Townsend are in fact at-will employees because they, unlike London, signed employment application forms on November 2, 2005, two weeks after the October short-form agreements were executed. This employment application was a four page document requesting biographical information such as education and employment history. The final page of the employment application contained express language stating that the signer acknowledges he is an at-will employee and that his employment may be terminated with or without notice, and

with or without cause. This at-will language was placed directly above the signature line signed by both Cruz and Townsend.

Defendants contend that the October 2005 short-form letters were preliminary proposals that stated the parties would negotiate long-form agreements containing the terms and conditions set forth in the letters, as well as any other mutually agreed-upon terms and conditions. Defendants contend that the November application forms were executed after the October short-form letters, and thus, constitute the long-form agreement containing the final expression of the parties' intent. However, the November document was an employment application, not an employment agreement. The application did not reference the earlier letter, did not reiterate the terms contained in the letters, and did not expressly state that it constituted the parties' final, integrated agreement. Moreover, while the short-form letters were negotiated documents signed by both plaintiff and defendant, the application was a pre-printed, standard form unsigned by any agent of the defendant. Given the conflicting express language of the October and November documents—one of which states that Cruz and Townsend are terminable by just cause only and the other which states that they are at-will employees—the court concludes that a genuine issue of material fact remains as to the employment status of these two defendants. Because neither the October nor the November documents were integrated agreements, the parol evidence rule does not bar admission of extrinsic evidence to determine the parties' intent and the circumstances surrounding the execution of the documents. Cal. Civ. Proc. Code § 1856(a). Accordingly, the court denies summary judgment as to the issue of whether Cruz and Townsend were terminable at-will or for just cause only.

II. Breach of Contract

Having concluded that CBS and London had an enforceable employment contract terminable by just cause only, the court now turns to the issue of whether CBS breached that contract when it terminated London for his conduct in soliciting the murder of Penn Jillette. Plaintiffs argue that the court should grant its motion for summary judgment because under California "just cause" law, defendants may not terminate an employee without first conducting an adequate investigation

including notice to the employee and a chance to be heard. Plaintiffs also argue that the court should deny defendant's motion for summary judgment because given the circumstances under which London performed his contract, genuine issues of material fact remain as to whether London's conduct constituted just cause.

There is no dispute that London's solicitation in fact occurred and was the basis for his termination. There is also no dispute that, other than the just cause language in the contract, the parties did not discuss or memorialize what just cause meant. Accordingly, this case involves an implicit just cause contract governed by California common law. Binder v. Aetna Life Ins. Co., 75 Cal. App. 4th 832, 852 (1999) (although parties are free to contract on the meaning of just cause, in the absence of an express agreement, the default California common law applies).

### A. Procedural Requirements

Plaintiffs rely heavily on Cotran v. Rollins Hudig Hall Int'l, 17 Cal. 4th 93 (1998), to argue that California "just cause" law prohibits an employer from terminating an employee without first conducting an adequate investigation and providing the employee with notice and a chance to be heard. Based on this proposition, plaintiffs argue that defendants violated California "just cause" law because CBS's CEO Joel Hollander did not give London a chance to present his side of the story and failed to gather sufficient facts on which to base his decision to terminate. Because Hollander's lack of investigation is undisputed, plaintiffs argue, summary judgment should be granted in their favor.

Plaintiffs are mistaken. Cotran addressed "the question the jury answers when the discharged employee denies committing the acts," such as sexual harassment, "that provoked the decision to terminate employment." Cotran, 17 Cal. 4th at 99. The Cotran court held that the jury does not determine whether the conduct actually occurred, but "assess[es] the objective reasonableness of the employer's factual determination" regarding the occurrence or non-occurrence of the conduct. Id. at 103. In making its assessment, the jury considers what facts and evidence the employer gathered through an adequate investigation including a chance for the employee to

respond. Cotran's reach is narrow and applies only when the employee disputes the occurrence of the underlying conduct leading to the termination. Binder, 75 Cal. App. at 854 ("the primary thrust of Cotran is not involved" in a case where plaintiff did not dispute submitting a false invoice for which he was terminated). Cotran does not stand for the broad proposition that an investigation and hearing are always required before a just cause employee is terminated.

In this case, it is undisputed that London offered money for Jillette's murder and that this murder solicitation was the conduct that led to his termination. Cotran's requirements relating to the employer's investigation and the employee's chance to be heard are therefore not directly applicable. That is not to say, however, that Cotran's underlying principles are entirely irrelevant here. Abdelaziz v. D-Arrigo Bros. of California, 2004 WL 1588289 at 5 (2004). Cotran was based on the broad principle to balance "the employee's interest in continuing employment with the employer's interest in efficient personnel decisions." Cotran, 17 Cal. 4th at 103. A just cause employee who has an interest in continuing employment cannot be terminated, like an at-will employee, without sufficient reason or cause. At the same time, once the employer determines that the conduct in fact occurred and the employee does not dispute the conduct, the employer is not necessarily required to continue an investigation and give the employee a chance to respond. An employer has an interest in efficient personnel decisions.

Here, it is undisputed that CEO Joel Hollander did in fact listen to a recording of London's murder solicitation prior to making a decision to fire London. Hollander also contacted Ken Kohl, the station manager, to ask why London should not be fired, and he consulted with CBS attorneys. At no time then or now did London dispute the occurrence of his murder solicitation. To the extent that Cotran requires investigation at all in cases where the employee's conduct is undisputed, CBS's obligation was satisfied. The court concludes that defendants did not violate California "just cause" law by failing to conduct a more thorough investigation or to provide plaintiff with notice and a chance to be heard.

B.  Meaning of Just Cause

Many of plaintiffs' arguments regarding the additional investigation that Hollander should have conducted go to the issue of what constituted good cause. Plaintiffs argue that Hollander lifted London's murder solicitation out of context, making no effort to understand the surrounding circumstances regarding what kind of radio show London was hired to perform and did in fact perform. He did not contact London directly, he did not ask why local management had decided to broadcast the show, and he did not review London's contract. Here, lack of investigation is not a violation of the procedural protections applicable to cases like Cotran where the underlying conduct is in dispute. But to the extent that further investigation would have given Hollander a more thorough understanding of the surrounding circumstances, it raises a genuine issue of material fact regarding the parties' understanding of the meaning of just cause.

As previously mentioned, the parties agreed on the "just cause" contract language but they did not discuss or memorialize the meaning of the phrase. In the absence of an express contractual definition, California common law describes just cause as "fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to the business needs or goals, or pretextual." Cotran, 17 Cal. 4th at 108. In deciding whether good cause exists, a court must "determine what the parties have implicitly agreed will constitute good cause" by examining "the circumstances in which [that] agreement arose, and the conduct which gave rise to [it]." Binder, 75 Cal. App. 4th at 855 (1999). The meaning of just cause is "relative" and depends on the particular case. Id. Whether an employee's conduct is good cause for termination is an issue that may be determined on a summary judgment motion. Id. at 841.

For example in Binder, although the employee did not dispute that falsification of an invoice was the basis for his termination, he did dispute whether this conduct was "just cause." Id. The evidence showed that the employer's internal operating policies and manuals generally prohibited "dishonest" conduct. Id. at 857. On the other hand, the evidence also showed that the employer handled separate, but similar incidents "quite differently" and that the employee's falsification was an isolated event in an otherwise unblemished record of good performance. Id. Although this

11

evidence "suggest[ed] a strong possibility . . . that a trier of fact would resolve the issues in favor of the [employer]," the court held that "the evidence did not conclusively establish that there were no triable issues of material fact" as to whether there was good cause. Id. at 837. The court reversed summary judgment granted to the employer. In contrast to Binder, courts have upheld summary judgment for the employer where there is no genuine issue of fact as to whether just cause existed. Moore v. May Dep't Stores Co., 222 Cal. App. 3d 836 (1990) (just cause existed where employee left unattended jewelry worth over $50,000 in violation of clear company policy the employee was aware of and perhaps had helped to draft); Knights v. Hewlett Packard, 230 Cal. App. 3d 775 (1991) (just cause existed where employee failed to return to work after being given repeated warnings to do so).

Plaintiff London argues that given the circumstances and context surrounding the formation and performance of his employment contract, factual disputes remain as to whether his kill-Penn-Jillette offer constituted good cause. Plaintiffs argue that, unlike the Moore and Knights cases, CBS has not identified any company policy that London has violated and that no one at CBS gave any prior warnings to London to tone down his show. CBS hired London to perform a violent and confrontational radio show and once the show was on the air, his conduct was not only tolerated, but was also approved, encouraged and praised. Indeed, "John London's Inferno" was the top rated talk-show program on KIFR-FM. None of the show's prior segments related to the killing of Penn Jillette were ever dumped by the station screeners. And there is no evidence that any audience member actually took up London's offer. While plaintiff's agent Lisa Miller believed London's conduct constituted just cause, the local station manager Ken Kohl did not believe London's conduct was just cause. Miller Dep. 147:8–22; Kohl Dep. 238:9–240:5. In short, plaintiffs argue that London's kill-Jillette offer was just part of the act.

Defendants argue that even if London had performed violent segments previously, this particular murder for hire crossed the line. CBS was concerned that "[a] nut job could be listening to the radio, know where [Jillette] lives in Las Vegas" and take London up on his offer. Barnett Dep. 228:11–15. Defendants argue that London's conduct was, in Hollander's term

"unconscionable," and therefore constituted good cause. Given the evidence in the record, the court concludes that a reasonable jury could find that London's conduct constituted good cause. At the same time, a reasonable jury could also find, in light of the condition under which London was hired and the intended program content, that London's conduct did not constitute good cause. The court concludes that genuine issues of material fact remain on the issue of whether London's conduct constituted just cause to terminate.

CONCLUSION

The court DENIES plaintiffs' motion for summary judgment and DENIES defendants' motion for summary judgment.

IT IS SO ORDERED.

Dated: 1/31/2008

MARILYN HALL PATEL
United States District Court Judge
Northern District of California